70230. N. L. INDUSTRIES, INC. v. MADISON.
70231. SAYLER MANUFACTURING CORPORATION
v. MADISON.
(336 SE2d 574)

POPE, Judge.

Appellee William J. Madison brought this action for damages for personal injuries suffered as the result of the alleged negligence of

appellants N. L. Industries, Inc. (Baroid Petroleum Services, hereinafter "Baroid") and Sayler Manufacturing Corporation (hereinafter "Sayler"). Madison was injured while attempting to board the Gulf Fleet Number 34, a vessel owned and operated by Gulf Fleet Atlantic, Inc. (hereinafter "Gulf Fleet") and upon which Madison was employed as a first mate. At the time Madison was injured, the Gulf Fleet Number 34 was moored to a docking facility owned by Sayler and leased to Baroid. Appellants answered denying liability, filed cross-claims against one another, and filed third-party complaints against Gulf Fleet. Trial of the case was bifurcated so that the issues relating to the third-party complaint could be heard separately. Following a trial on Madison's negligence claims against appellants, the jury returned a verdict in favor of Madison and against appellants in the amount of $111,000, and judgment was entered thereon less $26,778.75 paid to Madison by Gulf Fleet in return for a covenant not to sue. Appellants bring these appeals following the denial of their motions for new trial and j.n.o.v., and same have been consolidated for consideration here.

1. Both appellants challenge the sufficiency of the evidence to support the verdict and judgment entered against them and cite as error, inter alia, the trial court's denial of their motions j.n.o.v. The facts, construed most strongly in support of the verdict and judgment, show the following: Madison's employer, Gulf Fleet, conducted business as an oil industry service company. In July 1979 Gulf Fleet was using the Gulf Fleet Number 34 as a transport vessel to carry supplies and cargo to an oil rig some 50 miles off the Georgia coast. Dock space for the Gulf Fleet Number 34 was provided by Baroid at the Sayler facility along River Street in Savannah. Baroid had leased this facility from Sayler to use as a staging area for the storage and loading of supplies to be transported by Gulf Fleet's vessels. The lease agreement between Baroid and Sayler provided that Sayler was to retain the noninterfering use of the land, dock and rail siding. Baroid engaged in some repair and maintenance of the dock area and installed bulk tanks and nearby lighting. An officer of Sayler also held the dual role of salaried employee of Baroid, and Sayler's employees were hired to service the facility.

The dock space at which the Gulf Fleet Number 34 was berthed consisted of interlocking metal sheets forming a bulkhead which functioned as a retaining wall. Sayler constructed this facility in 1969 and is in the business of designing and building marine facilities. The Sayler facility was examined in 1979, prior to the subject incident, by John McNamara, an expert in marine construction and engineering. In his opinion the Sayler facility had been constructed with an inherent defect which permitted loose sand from behind the bulkhead to filter out from the base of the retaining wall. Such process is a com-

mon occurrence and results in the formation of hidden cavities beneath the surface of the dock which after time would give way under the weight of a man. He testified: "It creates a looseness in the soil because part of the particles have been extracted and washed out with the water. This means then that the soil is not compacted and if you put weight and compress that soil, it will create a depression but it won't create a hole. I mean, you won't fall all the way into the cavity." McNamara also testified as to certain measures which could be taken to remedy this situation. Sayler was advised of this defect prior to Madison's injuries.

The Gulf Fleet Number 34 arrived at the Sayler facility at approximately 8:30 or 9:00 p.m. on Friday, July 13, 1979. Madison left his vessel on foot and went into town. After making several small purchases at a local convenience store, he returned to River Street, stopping off at several restaurants/bars where he consumed slightly more than five mugs of beer. At approximately 1:00 a.m. on July 14, Madison returned to the Sayler facility to board his vessel. Lighting along the immediate dock area was dim, with one light fixture broken and dangling. Madison was injured when he positioned himself at the edge of the bulkhead and was preparing to step down a couple of feet to board his vessel. He approximated the distance from the edge of the bulkhead down to his vessel to be in relation to "stepping off a kitchen chair — not a jump, not a leap, not something I would have needed to swing across on a rope, but it was a good long step." He shifted his weight to his left foot to board the vessel when, according to Madison, the sand beneath his feet gave way, giving him a sinking sensation "like a very fast elevator." He fell forward, and his knee was forced to bend in the opposite direction from that which is normal. His left leg became entangled in a piece of cable at the front of a piling. For the next hour and a half, Madison hung suspended by his left leg, upside down and between the vessel and the retaining wall. He was eventually seen by a watchman on deck who helped disengage his leg. Madison stated that he was in shock at this point and had "managed to throw up all over myself." He was subsequently transported by ambulance to a hospital emergency room. At the hospital the nurse on duty noted on Madison's admission report: "smells of E.T.O.H." "E.T.O.H." was explained as meaning alcohol. Madison was treated and subsequently transferred to his hometown of Newport, Rhode Island for further treatment and care.

"Where an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe." OCGA § 51-3-1. "An invitation may be implied by a dedication, or may arise from known customary use, and it may be

inferred from conduct, if notorious or actually known to the owner or his authorized representative, or from any state of facts upon which it naturally and necessarily arises." *Smith v. Jewell Cotton Mill Co.*, 29 Ga. App. 461 (2) (116 SE 17) (1923). There is no merit whatsoever in appellants' implausible assertions on appeal that Madison was not an invitee upon the subject dock. Both appellants admitted in testimony at trial that Madison and other members of the crew of the Gulf Fleet Number 34 were invited, at least by implication, to use the premises. Moreover, under the facts in this case the "invitation" to the crew to traverse the dock naturally and necessarily arose by appellants' agreement with the vessel's owner to provide a docking facility. It is illogical to assume, in the absence of any evidence of a prohibition, that crew members, after having spent several days at sea, would not use the dock as a means of ingress and egress between the vessel and town. There is no evidence that Madison, at the time he was injured, was other than an invitee on the subject dock. Compare *Kinnebrew v. Ocean Steamship Co.*, 47 Ga. App. 704 (1) (171 SE 385) (1933).

Because Madison was an invitee on the dock when he suffered his injuries, appellants owed a duty to him to exercise ordinary care to keep the premises safe and/or to warn him of any hidden dangers or defects. "The owner or occupier of land is under a duty to invitees to discover and either keep the premises safe from or warn of hidden dangers or defects not observable to such invitees in the exercise of ordinary care." *Georgia Farmers' Mkt. Auth. v. Dabbs*, 150 Ga. App. 15, 16 (256 SE2d 613) (1979). "The duty to keep the premises safe for invitees extends to all portions of the premises which it is necessary for the invitee to use in the course of the business for which the invitation was extended, and at which his presence should therefore be reasonably anticipated, or to which he is allowed to go. . . . The duty to keep premises safe for invitees extends to hidden dangers. . . . A person responsible for such a dangerous place . . . must guard, cover, or protect it, for the safety of persons rightfully at or near it, and timely warning thereof should be given to such persons." *Coffer v. Bradshaw*, 46 Ga. App. 143 (7, 8) (167 SE 119) (1932). "It is well to observe that where, as in this case, an owner of property leases it to be used in the conduct of a business, those coming upon the premises in connection with the conduct of the business are invitees of the owner and proprietor alike." *Cooper v. Anderson*, 96 Ga. App. 800, 808 (101 SE2d 770) (1957), aff'd *Anderson v. Cooper*, 214 Ga. 164 (104 SE2d 90) (1958).

As to appellant Sayler, the evidence showed that it had constructed the subject dock, that it was the owner and landlord of the dock, and, further, that it had not fully parted with possession of the dock. Since Sayler constructed the dock, it is liable for any constructional defects therein. *Cooper v. Anderson*, supra at 811. Further, no-

tice to Sayler of any defects in the dock is conclusively presumed. *Fuller v. Louis Steyerman & Sons*, 46 Ga. App. 830, 835 (169 SE 508) (1933). In any event, the evidence shows that Sayler was informed by McNamara of the defective construction of the dock and its latent dangers prior to Madison's injuries, but took no action to remedy the defect or warn others of the danger. As an invitee, Madison was not obligated to inspect the premises to discover latent defects. *Misenhamer v. Pharr*, 99 Ga. App. 163 (1) (107 SE2d 875) (1959). The evidence of Madison's alleged intoxication did not demand a finding of contributory negligence. See generally *Rollestone v. Cassirer & Co.*, 3 Ga. App. 161 (5) (59 SE 442) (1907). Thus, from the evidence produced at trial, the jury was authorized to conclude that Madison's injuries were caused as the result of the latent defect in the dock and that Madison had no knowledge of same. Under these circumstances, the jury was authorized to find that Sayler was negligent and thus responsible to Madison for his injuries. See, e.g., *Lake v. Cameron*, 64 Ga. App. 501 (13 SE2d 856) (1941).

As to appellant Baroid, "[a] tenant in possession of the premises is liable to any person who comes thereon upon the invitation of the tenant, for want of ordinary care in warning the invitee of any defective condition of the premises, *known to the tenant* and unknown to the invitee. The fact that the landlord might also be liable for the defective construction does not preclude the liability of the tenant." (Emphasis supplied.) *Fuller v. Louis Steyerman & Sons*, supra at 830 (1). "Here the evidence did not establish the actual knowledge [by Baroid] of the alleged dangerous or unsafe condition. There was no evidence to indicate the propriety or necessity of making an inspection to ascertain the possible or probable existence of any defect, such as that other people had tripped or fallen. Ordinary diligence did not, as a matter of law, require an inspection where [Baroid] had no reason to believe an inspection was necessary. [Cit.] Since the condition which proximately caused the injur[ies] could not have been discovered in the exercise of ordinary care, i.e., could not be easily seen by an employee of [Baroid] in the immediate area, [Baroid's] liability would have to be based on a showing that it breached its duty to inspect and keep the premises in a safe condition. [Cit.] In the absence of any evidence that the defect existed at some time in the past, [Madison] failed to carry [his] burden of proof and was not entitled to recover [against Baroid]." *Hughes v. Winn-Dixie Stores*, 142 Ga. App. 110 (1) (235 SE2d 619) (1977). See *Roberts v. Wicker*, 213 Ga. 352 (99 SE2d 84) (1957); *Rhodes v. B. C. Moore & Sons*, 153 Ga. App. 106 (1) (264 SE2d 500) (1980). Further, there is no evidence establishing a causal connection between the allegedly inadequate lighting on the dock (for which Baroid was arguably responsible) and Madison's injuries. That is, there is no evidence that the particular defect al-

leged to have been the cause of Madison's injuries would have been exposed by brighter illumination of the dock. Compare *Bohn v. Beasley*, 51 Ga. App. 341 (180 SE 656) (1935). Therefore, the trial court erred in denying Baroid's motion for judgment notwithstanding the verdict. When the remittitur from this court reaches the trial court, direction is given that the verdict for Madison against appellant Baroid be vacated and that a final judgment be entered in favor of Baroid. See generally *Hearn v. Leverette*, 213 Ga. 286 (3) (99 SE2d 147) (1957).

2. Madison's medical records, prepared upon his arrival at the hospital by the emergency room nurse, contain the notation: "smells of E.T.O.H." As noted earlier, this abbreviation stands for alcohol. Appellants assign error to the trial court's refusal to allow testimony by either the nurse or the emergency room doctor which would have explained the "medical significance" of the notation. Appellants' proffer of proof showed that the notation usually indicated that the patient had exhibited some type of behavior which caused the nurse to investigate the possibility that the patient did indeed smell of alcohol. The nurse added: "Now I am in no way able to tell whether this person has a blood alcohol of .1 or .4 or what. All I can say is their [sic] behavior exhibited something that made me investigate a little bit further . . . . I chart it, and this is for the doctor's benefit, that he'll notice it when he is checking that patient so he will not give medication to the patient without checking further into this." The doctor too stated that the notation was made only if the person so noting thought it to be a significant clinical finding and that the patient was in some way impaired by alcohol. However, the doctor admitted that such a notation is not made for every patient who smells of alcohol. "Where the cut off point is, I can't define it."

Under the circumstances in this case, this enumeration of error presents no ground for reversal. Neither the nurse nor the doctor had any present recollection at the time of trial of Madison himself, his condition, or his injuries. Thus, neither witness could testify as to facts concerning the extent or degree of Madison's supposed "impairment" or the behavior exhibited by him which resulted in the subject notation. Compare *Smith v. State*, 141 Ga. App. 720 (2) (234 SE2d 385) (1977), wherein a diagnostic statement contained in a medical report was properly admitted upon the laying of a proper foundation, viz, "the person who entered the diagnostic opinions and conclusions qualified as an expert *and related facts upon which the entry was based.*" (Emphasis supplied.) Madison himself testified that he had been drinking on the night he was injured and that he may have been "impaired" in some way as a result, although he also testified that he "was not having any difficulty in walking or seeing or speaking or any of the things that are associated with being drunk. They claim that

one beer impairs you to some degree. I don't agree, but in that sense, perhaps I was." Assuming arguendo that the proffered testimony of the nurse and doctor was relevant to and probative of the issue of Madison's alleged "impairment" by his consumption of alcohol and thus his contributory negligence, its exclusion in this case was harmless error, if error at all, said testimony being merely cumulative of Madison's own testimony admitting possible "impairment." See *Arrington v. Andrews*, 152 Ga. App. 572 (3) (263 SE2d 491) (1979). See generally *Johnson v. State*, 196 Ga. 806 (2) (27 SE2d 749) (1943).

3. The trial court did not err in refusing to permit appellants to introduce evidence that Gulf Fleet purchased a gangway for the Gulf Fleet Number 34 approximately one week after Madison's injuries. This evidence was entirely irrelevant to the issues of negligence on trial in this case between Madison and appellants. In any event, Madison's uncontradicted testimony disclosed that under the circumstances in this case he very likely would have had to walk on the same area of the dock where his injuries occurred, notwithstanding the presence of a gangway. Thus, the presence vel non of the gangway was of no consequence in this case.

4. After careful review and in light of our holdings in the preceding divisions of this opinion, we find appellants' remaining enumerations of error present no ground for reversal. They are either moot or have no merit and require no further discussion.

*Judgment affirmed in Case No. 70231; judgment reversed with direction in Case No. 70230. Deen, P. J., and Beasley, J., concur.*

DECIDED OCTOBER 4, 1985 —
REHEARING DENIED OCTOBER 17, 1985 —

*Fred S. Clark, Robert S. Glenn, Jr., Harold Yellin,* for appellant (case no. 70230).

*Robert S. Glenn, Jr., Harold B. Yellin,* for appellant (case no. 70231).

*Bernard M. Portman, Edward J. Brennan,* for appellee.